1

2

3

4

5

6             **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

Khalil Rushdan,                              )        Case No. CV 05-114-TUC-FRZ (JM)
9                                            )
            Petitioner,                       )        **REPORT AND RECOMMENDATION**
10                                           )
v.                                            )
11                                           )
Dora Schriro, et al.,                         )
12                                           )
            Respondents.                      )
13 _____)

14          Pending before the Court are Petitioner's Petition for Writ of Habeas Corpus (Doc.

15  1) and Motion for Reconsideration of Voluntariness Claim (Doc. 121). In accordance with

16  the Rules of Practice of the United States District Court for the District of Arizona and 28

17  U.S.C. § 636(b)(1), this matter was referred to the Magistrate Judge for report and

18  recommendation. On May 4 and 5, 2010, the Court conducted an evidentiary hearing on

19  Petitioner's claim of vindictive prosecution.[1] At the close of the hearing, the Court ordered

20  Respondents to respond to Petitioner's Motion for Reconsideration. As explained below, the

21  Magistrate Judge recommends that the District Court, after an independent review of the

22  record, enter an order denying Petitioner's claim of actual innocence, denying as moot

23  Petitioner's claim of insufficiency of the evidence, but granting Petitioner's claims of

24  vindictive prosecution and involuntary statements, and granting the motion for

25  reconsideration and the petition for writ of habeas corpus.

26  _____

27          [1]The transcript of the May 4, 2010, hearing is filed as Document 135 and is referenced herein
    as "TR1." The transcript of the May 5, 2010, proceedings is filed as Document 136 and is
28  referenced herein as "TR2."

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

On March 20, 1997, a Pima County jury found Rushdan[2] guilty of first degree felony murder.  (R.T. 3/20/97, p. 97.)  The Arizona Court of Appeals described the pertinent factual background as follows:

> On November 9, 1993, [Rushdan] arranged for the victim [Francisco Soto] to sell cocaine to "Cujo" in Tucson.  The victim's dead body was found two days later in the trunk of his car in Yuma.
>
> In July 1994, Sergeant Fazz of the Yuma Police department contacted [Rushdan] in California, believing he might have been involved in the murder. [Rushdan] immediately told Fazz he was not the killer and then furnished the following information in a recorded statement. [Rushdan] admittedly had been the "middle man" who had arranged the drug transaction between Cujo and the victim, both of whom he knew.  After [Rushdan] introduced Cujo and his friends to the victim at an apartment where appellant's friend Clarence lived, Cujo sent [Rushdan] out to buy some baggies and baking soda.  When [Rushdan] returned to the apartment, Cujo and his friends were carrying the victim's body out in a blanket.  Cujo confronted [Rushdan] with a gun, and then Cujo and his friends placed the body in the trunk of the victim's car and drove away in it.
>
> After giving his recorded statement to Fazz, [Rushdan] fully cooperated in the investigation, including voluntarily taking a lie detector test and producing his gun for ballistics testing.  Based in part on the information [Rushdan] had provided, Cujo was identified as Sanford and ultimately brought to trial on a first-degree murder charge. [Rushdan] testified at Sanford's preliminary hearing, and the state introduced evidence that he had passed the polygraph exam, during which he had given his version of the events as noted above, and that ballistics tests showed that the bullet that had killed the victim had not come from [Rushdan's] gun.  After the hearing, [Rushdan] disappeared, was not subpoenaed, and did not testify at Sanford's trial.  Sanford was acquitted, and fourteen months later, [Rushdan] was arrested and charged with felony murder.

(Exhibit C, pp. 2-3.)[3]   On April 21, 1997, the trial court sentenced Rushdan to life

---

[2] Rushdan was prosecuted under the name Leslie Leroy Rush, but has since legally changed his name to Khalil Rushdan.  TR1:36.

[3] Unless otherwise noted, all referenced exhibits are those attached to Respondent's Answer to Petition for Writ of Habeas Corpus.

imprisonment with the possibility of parole after 25 years. (R.T. 4/21/97, p. 7.)

Rushdan appealed his conviction. (Ex. A.) In his Opening Brief filed in the Arizona Court of Appeals, Rushdan, who was represented by counsel, framed the issues as follows:

I. Whether the prosecution proceeded in this matter out of pure vindictiveness based on the fact that the prosecution failed to convict the actual shooter because of the prosecutor's mistakes.

II. Whether the statement made by appellant were involuntary when they were made based upon his belief that the police would protect him and his family and based on the promises that he would not go to jail or be charged with this murder.

III. There was insufficient evidence to convict appellant of felony murder because his statements were not properly corroborated.

(Exhibit B.) Addressing Issue One, the Court of Appeals determined it had not been raised at trial and was therefore waived absent fundamental error. (*Id.* at 3.) The court concluded there was no evidence to support Rushdan's claim and therefore found no fundamental error in Rushdan's claim for prosecutorial vindictiveness. (*Id.* at 4.) With regard to Issue Two, the court analyzed the underlying facts and found no basis for finding that Rushdan's statements were involuntary. (*Id.* at 7.) On Rushdan's third claim based on insufficient evidence, the court found "substantial evidence corroborating [Rushdan's] statement that he had been involved in the narcotics transaction that led to the murder," and therefore was sufficient to support his conviction for felony murder. (*Id.* at 9-10.) Rushdan sought review in the Arizonan Supreme Court which was denied without comment on January 12, 1999. (Exhibit D.) The Court of Appeals mandate was issued one month later, on February 12, 1999. (Exhibit E.)

On March 17, 1999, Rushdan filed a timely notice of post-conviction relief pursuant to Rule 32 of the Arizona Rules of Criminal Procedure, and the trial court granted Rushdan's request to toll the deadline for filing his Rule 32 petition because he intended to file a Petition for Writ of Certiorari in the United States Supreme Court seeking review of his direct appeal. (Exhibits F & G.) Rushdan then filed a Petition for Writ of Certiorari in the

United States Supreme Court raising the issue of prosecutorial vindictiveness and the Court denied review in a letter dated May 24, 1999. (Exhibit H.)

On January 6, 2000, Rushdan filed his first petition for post-conviction relief raising one claim (ineffective assistance of counsel) unrelated to his present habeas petition. (Exhibit I.) The trial court denied post-conviction relief, and the Arizona Court of Appeals granted review but also denied relief. (Exhibits J, K & L.) Rushdan sought and was denied review by the Arizona Supreme Court in an Order dated September 13, 2001. (Rushdan's Exhibit 11.) The Court of Appeals issued its mandate on October 3, 2001. (Exhibit M.)

On July 26, 2002, Rushdan filed a second notice and petition for post-conviction relief alleging actual innocence, a new and otherwise untimely claim which Rushdan contended was available to him under the then newly-enacted Rule 32.1(h) of the Arizona Rules of Criminal Procedure. (Exhibits N & O.) The trial court found that the claim was not precluded by Rule 32.2(a), Arizona Rules of Criminal Procedure, but denied the claim on the merits, concluding that:

> [Rushdan's] misconduct in facilitating the drug deal that resulted in the killing of one of the participants was a foreseeable risk of the operation . . . . Reasonable jurors could easily conclude that [Rushdan's] admitted felonious conduct 'set in motion a chain of events' that caused the seller's death.

(Exhibit P, p. 4.) Rushdan was granted review in the Arizona Court of Appeals, but relief was denied in an Order filed September 14, 2004. (Exhibit Q.) Rushdan's petition for review was denied by the Arizona Supreme Court on January 4, 2005, and the mandate issued on February 10, 2005. (Exhibit R.)

On February 11, 2005, Rushdan filed his Petition for Writ of Habeas Corpus in this Court raising four claims:

> 1.  Rushdan is imprisoned in violation of his right to due process and to be free from cruel and unusual punishment because he is actually innocent of felony murder because his acts did not cause the death of the victim.
>
> 2.  Rushdan's rights to due process, to counsel, and to be free from self-incrimination were violated when he was prosecuted in retaliation for the exercise of his

- 4 -

constitutional right to silence and the acquittal of the real killer.

3. Rushdan was convicted in violation of his rights to due process, to a fair trial, and to be free from self-incrimination because his statements used against him were involuntary.

4. Rushdan is being held in violation of his rights to due process because there is insufficient evidence to support his conviction.

*Petition*, p. ii.

On July 28, 2008, the Court issued a preliminary order finding Rushdan's claims meritless with the exception of his claim of vindictive prosecution and allowed discovery on that claim [Doc. No. 35]. The parties then proceeded with discovery and, as the Court was informed by counsel, reached a tentative settlement. When the settlement could not be finalized, a hearing was set for May 4 and 5, 2010.

## II.  **LEGAL DISCUSSION**

### A.  **The Petition is timely under the AEDPA**

The writ of habeas corpus affords relief to persons in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(c)(3). The petition must be filed within the applicable statute of limitations or it will be dismissed. The statute of limitations was created by the Antiterrorism and Effective Death Penalty Act (AEDPA) which reads in pertinent part as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

\*          \*          \*

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. §§ 2244(d)(1)(A) & (d)(2).

- 5 -

Under 28 U.S.C. § 2244(d)(2), the statute of limitations on Rushdan's federal habeas petition was tolled while he completed "one full round" of state collateral review. *Carey v. Saffold*, 536 U.S. 214, 222 (2002). Rushdan's state conviction became final on May 24, 1999, the date on which the United States Supreme Court entered its order denying Rushdan's petition for writ of certiorari. (Exhibit H.) However, Rushdan had previously, on March 17, 1999, filed his first notice of post-conviction relief, thereby tolling the one-year statute of limitation. (Exhibit F.) Rushdan's petition to the Arizona Supreme Court to review his first petition for post-conviction relief was denied on September 13, 2001, and the limitations period began to run. *Hemmerle v. Schriro*, 495 F.3d 1069, 1073-74 (9th Cir. 2007) (decision rather than issuance of mandate, signals conclusion of review); (Rushdan's Exhibit 11.) Rushdan filed his second notice of post-conviction relief 316 days later on July 26, 2002, and the limitations period was again tolled. (Exhibit N.) The second petition remained pending until January 4, 2005, when the Arizona Supreme Court denied review. The petition was filed 38 days later on February 11, 2005. *Docket No. 1.* Thus, exclusive of the periods of tolling, 354 days elapsed between the date Rushdan's state conviction became final and the filing of the instant petition. The petition is therefore timely.

**B.    Exhaustion of State Remedies**

A state prisoner must exhaust the available state remedies before a federal court may consider the merits of his habeas corpus petition. *See* 28 U.S.C. § 2254(b)(1)(A); *Nino v. Galaza,* 183 F.3d 1003, 1004 (9th Cir.1999). Exhaustion occurs either when a claim has been fairly presented to the highest state court, *Picard v. Connor*, 404 U.S. 270, 275 (1971), or by establishing that a claim has been procedurally defaulted and that no state remedies remain available, *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Exhaustion requires that a habeas petitioner present the substance of his claims to the state courts in order to give them a "fair opportunity to act" upon these claims. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999). A claim has been "fairly presented" if the petitioner has described the operative facts and legal theories on which the claim is based. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Rice v. Wood*, 44 F.3d 1396, 1403 (9th Cir.

1995). The operative facts must be presented in the appropriate context to satisfy the exhaustion requirement. The fair presentation requirement is not satisfied, for example, when a claim is presented in state court in a procedural context in which its merits will not be considered in the absence of special circumstances. *Castille*, 489 U.S. at 351, 109 S.Ct. at 1060. An exact correlation of the claims in both state and federal court is not required. *Rice,* 44 F.3d at 1403. The substance of the federal claim must have been fairly presented to the state courts. *Chacon v. Wood*, 36 F.3d 1459, 1467 (9th Cir. 1994) (citations omitted).

A petitioner may also exhaust his claims by either showing that a state court found his claims defaulted on procedural grounds or, if he never presented his claims in any forum, that no state remedies remain available to him. *See Jackson v. Cupp*, 693 F.2d 867, 869 (9th Cir. 1982). "To exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32," *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), and then present his claims to the Arizona Court of Appeals. *See Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir. 1999).

As Respondents note, Ground 1 of the petition was originally presented in Rushdan's second petition for post-conviction relief, which, although it raised a new claim, was found to not be precluded under Rule 32.2(a) of the Arizona Rules of Criminal Procedure. Grounds 2, 3 and 4 of the petition were originally presented in Rushdan's Opening Brief on direct appeal. Each of the claims was supported by citation to the United States Constitution or other federal authority. Accordingly, each of the claims was properly exhausted.

**C.     Merits**

Under the AEDPA, a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). *See Williams v. Taylor*, 120 S.Ct. 1495 (2000). A state court's decision

can be "contrary to" federal law either (1) if it fails to apply the correct controlling authority, or (2) if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000). In determining whether a state court decision is contrary to federal law, the court must examine the last reasoned decision of a state court and the basis of the state court's judgment. *Packer v. Hill*, 277 F.3d 1092, 1101 (9th Cir. 2002). A state court's decision can be an unreasonable application of federal law either (1) if it correctly identifies the governing legal principle but applies it to a new set of facts in a way that is objectively unreasonable, or (2) if it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Hernandez v. Small*, 282 F.3d 1132 (9th Cir. 2002).

### 1.  Actual Innocence

Rushdan asserts that he is being held in violation of his right to due process and to be free from cruel and unusual punishment because he is being punished for a crime that he did not commit. Rushdan was convicted under Arizona's felony murder statute under which defines the crime as follows:

> Acting either alone or with one or more other persons the person commits or attempts to commit . . . [an enumerated felony] . . . and in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person.

A.R.S. § 13-1105(A)(2). Specifically, Rushdan seizes on the requirement that the death must have occurred "in the course and in furtherance" of "the offense," and argues the "the robbers killed the seller to facilitate *their separate and distinct robbery*– not the narcotics sale." *Petition*, p. 6. Accordingly, he contends that the death did not occur in the course of and furtherance of the felony in which he was involved (a narcotics deal), but in the course and furtherance of a felony in which he was not involved (a robbery).

In addressing the merits of this claim, the Arizona Court of Appeals adopted the trial court's ruling and also relied on its own previous decision filed in Rushdan's direct appeal. (Exhibit Q.) In the ruling adopted by the Court of Appeals, the trial court addressed the

merits of Rushdan's claim of actual innocence and stated as follows:

> The parties agree that a felony murder defendant is not liable at criminal law when an intervening cause in which he participates causes the death of the victim and the intervening cause is also 'supervening.' *State v. Lopez*, 173 Ariz. 552, 555, 845 P.2d 478, 481 (App. 1992). The criminal standard under this test is identical to the civil standard. *State v. Bass*, 198 Ariz. 571, ¶ 13, 12 P.3rd 796, ¶ 13 (2000).

> A superseding cause relieves the defendant of liability based on a later, independent cause for which he is not responsible. *Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983). An event cannot be a superseding cause where the defendant's misconduct created the risk of the harm. *Young v. Environmental Air Prods.*, 136 Ariz. 206, 212[,] 665 P.2d 88, 94 (App. 1982). Moreover, an intervening criminal act does not necessarily constitute a superseding cause. *Petolicchio v. Santa Cruz County Fair*, 177 [Ariz.] 256, 263, 866 P.2d 1342, 1349 (1994).

> It is an unfortunate fact that violence and gun use is a foreseeable event in drug transactions. *See, e.g., State v. Lopez*, 173 Ariz. 552, 845 P.2d 478 (App. 1992) (accomplice killed by DEA agent during drug deal); *United States v. Johnson*, 886 F.2d 1120 (9th Cir. 1989) (reasonable to assume that a weapon of some kind will be present in an operation that sells cocaine); and *United States v. Gamez*, 301 F.3rd 1138 (9th Cir. 2002) (accomplice killed a border agent who stopped drug smugglers). It is recognized that in the drug culture "firearms are the tools of the trade." *United States v. Wilson*, 105 F.2d 219, 221 (5th Cir. 1997). Even assuming that most illegal drug transactions do not result in murder, it is nonetheless true that the risk of violence is sufficiently high that serious injury and death are much more likely to occur during a drug deal than any legal sales transaction.

> Defendant's counsel asserted in oral argument that an evidentiary hearing is required for the Defendant to establish that he had no subjective expectation that the seller would be killed. Further, counsel contest the conclusion in the case law that firearms and injury or death are reasonably foreseeable concomitants of a drug deal. Defendant hopes that he can establish these propositions through the testimony of the shooter, police officers, or himself. Other than counsel's representation that Defendant would testify to the effect that he did not believe anyone would be killed in the cocaine deal, Defendant offers no proof that the shooter or the police officers would so testify. The Court accepts that Defendant would testify that he did not expect that anyone would be killed in the drug deal. Without some positive assurance that the other potential witnesses would testify along the lines suggested by counsel, an evidentiary hearing is not required. Moreover, the subjective beliefs of these potential witnesses about the relative likelihood of violence in this drug deal would carry little weight

- 9 -

without corroborating facts.  Defendant presents no such facts.

> Defendant admits facilitating an illegal cocaine deal between out-of-state buyers and an Arizona supplier.  He presents no evidence that this drug deal was likely to be safer than the usual drug deal.  Defendant does not establish by clear and convincing evidence that no reasonable fact-finder could have found him guilty of felony murder.  To the contrary, most reasonable jurors would conclude that it was likely that one or more of the participants in this cocaine deal would have guns to protect themselves or to take advantage of the situation.  Defendant's misconduct in facilitating the drug deal that resulted in the killing of one of the participants was a foreseeable risk of the operation.  *See State v. Lopez, supra,* and *United States v. Gamez, supra*.  Reasonable jurors could easily conclude that Defendants's admitted felonious conduct 'set in motion a chain of events' that caused the seller's death.

(Exhibit P, pp. 3-4 (footnote omitted).)  In support of denying relief the court also quoted the following from its previous decision:

> [t]hus, evidence separate and apart from appellant's own statements indicated that he was involved with the transaction that directly led to the shooting and was aware of the victim's death very soon after it occurred.  The evidence viewed in its totality, was sufficient to corroborate appellant's confession and support his conviction for felony murder.

(*Id*. at 4.)

Rushdan, citing *In re Winship*, 397 U.S. 358 (1970), contends that this analysis of the statute is incorrect and unconstitutionally relieves the state of its obligation of proving all the elements of his felony murder conviction.  Soto's death, he contends, did not occur in the course of and in furtherance of the drug deal, of which he was admittedly a part, but in the course of and in furtherance of the buyers' decision to rob Soto.  In *Winship* the Supreme Court explicitly held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *Id*. at 1073.  The facts in Rushdan's case simply do not support a finding that this standard was violated.

Rushdan's efforts to segregate the robbery from the drug deal are unconvincing.  As the trial court found,  most reasonable jurors would conclude that it was likely that one or more of the participants in this cocaine deal would have guns to protect themselves or to take

advantage of the situation and that Rushdan's misconduct in facilitating the drug deal that resulted in the killing of one of the participants was a foreseeable risk of the operation. This Court can not find a reason to disagree with the trial court's determination that reasonable jurors could easily conclude that Rushdan's conduct 'set in motion a chain of events' that caused the seller's death as it is recognized that in the drug culture "firearms are the tools of the trade." (Exhibit P, pp. 3-4, *citing United States v. Wilson*, 105 F.2d 219, 221 (5th Cir. 1997).) The court is largely at a loss when it comes to discrediting this analysis in any way, much less finding it legally or factually unreasonable. This analysis involved neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## 2.    Vindictive Prosecution

Rushdan next argues that his "rights to due process, to counsel and to be free from self-incrimination were violated when he was prosecuted in retaliation for the exercise of his constitutional right to silence and acquittal of the real killer." *Petition*, p. 16. Rushdan contends that the prosecutor was sending a message of "cooperate with us to convict the real killer, and you'll stay out of trouble." *Id*. Specifically, he contends that he can establish that former Deputy County Attorney Kenneth Peasley's decision to prosecute him was vindictive because:

> (1) Detective Fazz gave untimely and inadequate *Miranda* warnings, (2) Detective Fazz gave explicit and implied assurances to Rushdan that he and his family would be protected from retaliation, (3) Detective Fazz gave explicit and implied assurances that Rushdan would not go to jail, (4) both the lead detective and the prosecutor failed to advise Rushdan of the potential charges he was facing, (5) the prosecutor failed to grant Rushdan immunity in exchange for his self-incriminating statements which composed the case against the real killer, (6) [and] the prosecutor failed to request an attorney be appointed to advise Rushdan of his constitutional rights and his potential criminal liability.

*Petition*, pp. 16-17. Further evidencing the vindictiveness of his prosecution, Rushdan contends, was the timing of the prosecution and the decision to charge him only with first-degree murder and not the drug offense. *Id*. at 18-19.

Vindictive prosecution violates due process. *Moran v. Burbine*, 475 U.S. 412, 466 (1986) (citation omitted). "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). "'[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler v. Boles,* 368 U.S. 448, 456 (1962) (alteration in the original)). For example, a "prosecutor violated due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right." *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217 (9th Cir. 2001).

"To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such." *United States v. Montoya*, 45 F.3d 1286, 1299 (9th Cir. 1995) (internal quotation marks and citation omitted). If the Rushdan is able to provide "[e]vidence indicating a realistic or reasonable likelihood of vindictiveness" this "give[s] rise to a presumption of vindictiveness on the government's part." *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993). The burden then shifts to the prosecution to show that "'independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions.'" *Montoya*, 45 F.3d at 1299 (quoting *United States v. Hooton*, 662 F.2d 628, 633 (9th Cir. 1981).

In rejecting Rushdan's claim for prosecutorial vindictiveness, the Arizona Court of Appeals found that the claim had not been raised in the trial court and reviewed the claim only for fundamental error. (Exhibit C, p.3.) After reciting Arizona law on the issue, which is the same as the federal law recited above, the court of appeals provided the following analysis:

> In the present case, there is no evidence that the prosecutor charged the appellant because he exercised a legal right. Although appellant alludes to alleged violations of his Fifth

> Amendment rights, he does not establish how he was punished for exercising those rights, but rather, only argues that he was prosecuted "due to a lack of a conviction in the Sanford trial."

(Exhibit C, p. 4.)  The court does not find that this is a reasonable determination of the facts in light of the evidence presented in the State court proceeding.

Rushdan's obligation, as recognized by the Arizona Court of Appeals and reiterated above, is merely to present evidence indicating a realistic or reasonable likelihood of vindictiveness. *Garza-Juarez*, 992 F.2d at 906; *State v. Tsosie*, 171 Ariz. 683, 687 (App. 1992).  Here, Rushdan asserts that he was prosecuted because, *inter alia*, he exercised his right against self-incrimination by not testifying at Sanford's trial.  Why the court of appeals did not consider his prosecution as possible punishment for his failure to testify at Sanford's trial is unclear.  Based on Peasley's hearing testimony, however, it is clear that Rushdan was prosecuted for no other reason.

Peasley, who independently made charging decisions, elected to only charge Sandford, as Peasley believed that he was the shooter. TR1:111.  At that time, Rushdan was cooperating and Peasley wanted Rushdan to be a witness and not a defendant, as Peasley believed that was his only chance for getting a conviction.  TR1:111-12.  Peasley also recognized that had he offered Rushdan use immunity or a plea agreement for his testimony, he would have to disclose that agreement to Sandford's defense counsel. TR1:117.  As such, there was no written agreement between Peasley and Rushdan regarding his testimony. TR1:119.  Nevertheless, Peasley explained the nature of what he believed was his "understanding" with Rushdan:

> That as long as he cooperated and came to the preliminary hearing, which he did, and came to the trial, which he didn't, that he was going to be a witness and go home.  If he failed to cooperate, didn't show up at the preliminary hearing or didn't show up at trial, then bad things were going to happen to him.

TR1:119.  Thus, in Peasley's mind, he had an agreement with Rushdan, "just not a written agreement."  TR1:122.

At the time of Sandford's preliminary hearing, September 7, 1994, Peasley was aware that Fazz was telling Rushdan that he could be charged. TR1:115.  Peasley never expressed

- 13 -

this directly to Rushdan, rather he relied solely on Fazz's statements to Rushdan that he could still be charged. TR1:115, 127-28. Prior to the preliminary hearing, Rushdan was cooperating with Fazz and had taken a polygraph. TR1:58. Rushdan met with Fazz between 15 and 20 times, including meetings after Sandford was questioned. TR1:58-60. During that time frame, Rushdan began getting pages suggesting he was going to be killed. TR1:61. Fazz told Rushdan that he would be protected. TR1:62.

After Sandford was arrested, Peasley and Fazz arranged for Rushdan to travel to Tucson for Sandford's preliminary hearing. TR1:62-63. When Rushdan met with Fazz and then Peasley, he informed them of the threats he was receiving. TR1:64. Fazz never gave him an answer about how he would be protected. Peasley ignored the issue of Rushdan's safety, telling Rushdan that he was there to go over his preliminary hearing testimony. TR1:64. Peasley also mentioned nothing about a deal or arrangement regarding Rushdan's testimony and at no time suggested that Rushdan might need a lawyer. TR1:65-66. After the preliminary hearing, Fazz told Rushdan to retrieve a gun he had owned for ballistics testing, and also told him that he could still be charged. TR1:70. Rushdan was "in shock," thinking, "they're still going to charge for these drugs after everything I've been through." TR1:70. Rushdan believed his concerns were not being addressed, that he was being "blown off" by Peasley and Fazz, and after he arranged with Fazz to buy the gun back from the individual to whom he had sold it, decided that he was no longer going to cooperate. TR1:73. As he explained:

> I mean, here I am, I put my neck on the line and [Fazz] told me I wouldn't go to jail and then he's going to turn around and he's, you know, and – I didn't know if it was Fazz or the County Attorney, but, you know, they're going to turn around and charge me with the drugs, I'm – I'm done. I'm done dealing with them, but I was going to make sure they had that gun.

TR1:7374. Rushdan then left for Ohio. On Memorial Day in 1996, he was stopped for a driving infraction and was arrested on an Arizona warrant for first degree murder. TR1:74.

By gaming the situation as he admittedly did, Peasley positioned himself to get what he needed without giving up anything. He was positioned to get Rushdan's testimony, but

by not charging him, counsel was never appointed, and Peasley was able to manipulate the situation such that Rushdan would seek nothing in exchange for his testimony and there would be no written agreement between Rushdan and the State that would have to be disclosed to Sanford's defense counsel. Peasley knew that if he charged Rushdan initially, the court would have appointed a lawyer to represent him. TR1:124. Peasley indicated that in all likelihood, if Rushdan would have had a lawyer, "the lawyer would have insisted upon an agreement and I almost assuredly would have agreed to a stipulated probation because I needed him for the shooter." TR1:123-24. Peasley testified that if Rushdan had been appointed counsel, the lawyer would not have permitted him to testify without a written agreement. TR1:121-22. Peasley, however, did not want to lose the tactical advantage of not having a written agreement. TR1:122. In Peasley's mind, Rushdan was better off without a lawyer. TR1:125. As Peasley recognized, given that there was no written agreement, he was the sole arbiter of whether Rushdan was in compliance with their "agreement." TR1:130.

Rushdan was not subpoenaed to testify at the Sanford trial. TR1:132. When Rushdan did not show up to testify against Sandford, Peasley sought to have his preliminary hearing testimony admitted. TR1:137. During that hearing, the judge inquired of Peasley about any deal Rushdan may have had with the State in relation to testifying, and Peasley stated, "There is no agreement." The court then inquired further, asking, "You have no agreement with Mr. [Rushdan]?" To which Peasley replied:

> No. And in fact, I talked to Mr. Fazz. When I talked to Mr. Fazz when Mr. [Rushdan] came in today, I was clear that I wanted to make sure that nobody promised Mr. Rush that there would be an agreement that he would not be charged and I left open the possibility depending upon the status of the case that I could charge him if I chose to. He has no agreement with the State of Arizona, didn't have it at the time of the preliminary hearing, does not now.

TR1:138. Similarly, in his closing statement at Rushdan's trial, Peasley stated that:

> There is absolutely no evidence whatsoever that there was any kind of an agreement that was ever made in this case. There is nothing – that is nothing more than [Rushdan' counsel] Mr. Darby telling you that. If there was an agreement made in this

- 15 -

case, you could be sure that Mr. Darby would be in court trying to enforce the agreement. There was none. There was no agreement. So whatever Mr. Darby tells you about that when he suggests to you that there was an agreement not to prosecute this defendant in exchange for his cooperation against Cujo, Dennis Sandford, not true. Ask yourself, is there any evidence of that whatsoever except for what Mr. Darby said? Simply false. There is no agreement, never was an agreement, wasn't going to be an agreement in this case and in fact you ask yourselves, was there any evidence of that whatsoever?

TR1:140.

When questioned at the present hearing about the discrepancy in his testimony, Peasley explained that when he testified in state court he was referring to there being no agreement that Rushdan would not be charged. TR1:142. Peasley minimized the effect of the "understanding" on Rushdan's cooperation, asserting that probable cause to charge Rushdan for felony murder existed from the time of Fazz's initial interview with Rushdan in California. TR1:143. However, it is not Peasley's ability to charge Rushdan that is at issue. In fact, "[v]indictive prosecution cases always involve circumstances where the prosecution is acting within its power." *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir. 1988), *abrogated on other grounds by Walton v. Arizona*, 497 U.S. 639 (1990). Rather, it is his motivation for charging Rushdan that is at issue.

Here, by playing fast-and-loose with the truth and a man's constitutional rights, Peasley lost his star witness and Sanford walked out of court a free man.[4] Peasley admits that, during the Sandford trial, he was angry that Rushdan did not show up to testify. TR1:130. As Peasley explained, "So because he doesn't show up, in large part, the shooter walks out the back door completely scot-free with no consequence. I was not happy with him at that point . . . ." TR1:131. Peasley was asked if anger was the basis for his decision to prosecute Rushdan and explained:

No. Clearly I was upset. I mean, to say that I was angry would be a fair statement. To say that I was upset or frustrated you

---

[4] On May 28, 2004, Peasley was ordered disbarred by the Arizona Supreme Court for intentionally eliciting false testimony against two defendants in capital murder trails in 1993 and 1997. *In the Matter of Kenneth J. Peasley*, 90 P.3d 764 (2004) (*en banc*).

- 16 -

> want to – clearly, I was all of that and I was unhappy. Mr.
> [Rushdan] didn't keep – he didn't show up at trial, he didn't
> show up to testify, a guy who shoots and kills another human
> being walks out the backdoor, I am not pleased. I charged him
> though, because he didn't show up for trial like he was supposed
> to and I charged him because I had the evidence to do that.

TR1:153. Peasley eventually charged Rushdan with felony murder 14 months later, in June

of 1995. TR1:157.

As the judge presiding over the Sandford trial succinctly noted, not having an

agreement gave Rushdan "all the more reason not to be here [at Sandford's trial]." TR1:161.

The fine line Peasley was attempting to walk is illustrated by his explanation of why he did

not have to disclose his "arrangement" with Rushdan:

> if I had told [Rushdan], with in a conversation with [Rushdan]
> directly or through a detective or a staff person in the County
> Attorney's Office, hey, Mr. [Rushdan], don't worry about it, all
> you've got to do is show up and testify and you won't be
> charged, if I told him that, then clearly I am obliged to tell the
> court and the defense attorney about it. When [Rushdan] is not
> told that, he's told to the contrary, that he can be charged at any
> time, there is nothing to disclose. I mean, the bottom line is he
> knows he has to be there, he testified he knew he had to be
> there, and that the could be charged, that was it. There was
> never an agreement . . . that he wouldn't be charged. It just
> didn't happen.

TR1:162-63.

David Darby, Rushdan's defense lawyer, recalled that Peasley was "a maniac" about

Rushdan. Peasley had "such a bee in his bonnet" about Rushdan that Darby asked him why

and Peasley responded, "Because he fucked me." Pet.'s Exs. for Evidentiary Hrg., Ex. 1.,

¶ 5. It is plain to see from the record, however, that Peasley created the situation that led to

Sanford's acquittal. As Peasley admits, if he had charged Rushdan initially and/or offered

him immunity or a plea agreement, a written agreement to testify likely would have resulted.

Had he chosen that course, and Rushdan had not testified, this Court would find that

"'independent reasons or intervening circumstances dispel the appearance of vindictiveness

and justify [Peasley's] decisions.'" *Montoya*, 45 F.3d at 1299 (quoting *United States v.

Hooton*, 662 F.2d 628, 633 (9th Cir. 1981). However, by approaching the Sanford case as he

did, and in not getting a written agreement, Rushdan was under no formal obligation to

testify. Accordingly, Rushdan violated no agreement when he elected to cease cooperating and to exercise his Fifth Amendment rights by not testifying against Sanford and incriminating himself in the process. In doing so, however, he incurred the wrath of Peasley. Although no facts relevant to Rushdan's potential prosecution had changed, Peasley then decided to charge Rushdan with felony murder. No intervening event supports the notion that Peasley's charging decision arose from "the prosecutor's normal assessment of the societal interest in prosecution." *United States v. Goodwin*, 457 U.S. 368 (1982). The only plausible explanation for that decision is that Peasley was seeking vindication for Rushdan's decision not to testify against Sanford. It was within his rights to refuse to do so. The fifth amendment secures "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). The record here clearly establishes that Rushdan suffered a penalty for his silence and the State court's determination to the contrary is unreasonable. As such, Rushdan is entitled to relief on this claim.

In reaching this conclusion, the Court also rejects Respondents' contention that this case does not fit the paradigm for vindictive prosecution. As Respondents note, vindictive prosecution is typically evidenced by a prosecutor's decision to increase charges against an already charged defendant. *See, e.g., United States v. Robison*, 644 F.2d 1270 (9th Cir. 1981); *United States v. Martinez*, 785 F.2d 663 (9th Cir. 1986). However, the Supreme Court has recognized that claims of vindictive prosecution might well arise, as it does in this case, where "the prosecutor's charging decision was motivated by a desire to punish [a defendant] for something that the law plainly allowed him to do." *United States v. Goodwin*, 457 U.S. 368, 384 (1982). The Ninth Circuit has also found that the filing of the initial indictment can serve as a basis for a claim of vindictive prosecution. *United States v. McWilliams*, 730 F.2d 1218 (9th Cir. 1984). Thus, while the facts of this case may not fit the paradigm, the law is clear that Peasley's improper motives provide more than a sufficient basis to establish vindictive prosecution.

### 3. Involuntary Statements

Rushdan next claims that his Fifth Amendment right against self-incrimination was violated by the State courts' denial of his motion to suppress his statements to Detective Fazz. A suspect who is subject to custodial interrogation has the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An officer must give a suspect *Miranda* warnings before interrogation only when the individual is "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). To determine whether an individual was in custody, a court must, after examining all the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The outcome of this inquiry "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323.

The last reasoned state court rejection of this claim is the decision of the Arizona Court of Appeals on Rushdan's direct appeal. (Exhibit C.) The Court of Appeals first noted that Rushdan claimed that Fazz "led him to believe that the police would protect him and his family from recriminations for his testimony and that [Rushdan] would not be put in jail for the murder if he cooperated." (*Id.* at 4-5.) Then, after reciting the applicable law, the court set forth the facts relevant to the claim as follows:

> We first note that Fazz gave appellant *Miranda* warnings, and appellant clearly waived his rights before he answered any questions in the recorded interview. Appellant confirmed in the interview that Fazz had not made any promises or threats and that he was talking only because he wanted to show he was not the killer. Appellant argues, however, that Fazz had told him he would not be arrested if he cooperated, that Fazz would tell the Yuma County Attorney that appellant was cooperating, that Fazz would make sure appellant did not suffer any repercussions by talking, and that Fazz would protect him.

*Id.* at 6-7. Then, after providing additional authority relevant to voluntariness, the court continued with the following facts and analysis:

> Fazz's testimony at the voluntariness hearing and the transcript of appellant's recorded statement show that Fazz did not make any express or implied promises on which appellant could have relied. Fazz told appellant that his cooperation "may help

- 19 -

[appellant] in being able to go home tonight," but he did not promise that appellant would not be sent to jail. Although Fazz told appellant he was "not going to put [appellant] in jail or anything," Fazz also stated he would have to "talk to the County Attorney and run it past them," and "[h]e may decide no, we need to put him in jail." Fazz emphatically denied ever telling appellant "he wouldn't be prosecuted if he cooperated or talked to [him] in this case," and appellant's recorded statement reveals no such assurance. Indeed, appellant testified at the voluntariness hearing that Fazz had told him "it would be up to the County Attorney's Office" to decide what was going to happen to him, and that Fazz had not told appellant he would be free from prosecution for the charges.

Fazz's statement that he would discuss with the county attorney how to keep appellant "involved with this without getting [appellant] into any trouble" came immediately after appellant asked if he had "to get on the (inaudible)– on the stand" and if "they have closed courtroom or something like that." Although appellant expressed concern about threats he had received from both the victim's family and Sanford, Fazz only said he would "do everything in [his] power to make sure that no harm comes to [appellant]" and urged appellant to call him if Sanford or "his guys" appeared.

Viewed in context, the foregoing statements by Fazz do not constitute the kind of promises that would render appellant's statement involuntary. *See State ex rel. Collins v. Superior Court*, 145 Ariz. 493, 702 P.2d 1338 (1985); *State v. Doody*, 187 Ariz. 363, 930 P.2d 440 (App. 1996), *cert. denied*, _____ U.S. ___, 117 S.Ct. 2456 (1997). Any conflicts in the testimony and witness credibility issues bearing on the voluntariness determinations were for the trial court to resolve. *State v. Alvarado*, 158 Ariz. 89, 761 P.2d 163 (App. 1988). Contrary to appellant's unsupported assertion, Fazz was not obligated to tell appellant about the felony murder rule or the specific charges he potentially might face, and his failure to do so does not necessarily render appellant's statement involuntary. *See* A.R.S. § 13-3988(B); *State v. Walden*, 183 Ariz. 595, 905 P.2d 974 (1995); *cf. State v. Tinajero*, 188 Ariz. 350, 935 P.2d 928 (App. 1997). Finally, also contrary to appellant's suggestion, the record does not reflect any unrecorded promise Fazz made or on which appellant relied before he was read the *Miranda* warnings and then gave his recorded statement.

Appellant also argues that the relationship and rapport he developed with Fazz led him to rely on Fazz's promises of protection and induced his cooperation. This argument is without merit for two reasons. First, appellant's recorded statements were made the first day he met Fazz, before any relationship or rapport could have developed. Second, although appellant testified at Sanford's preliminary hearing after allegedly developing a relationship with Fazz, Fazz never made any promises to appellant on which he could have relied, and the state did not use appellant's preliminary hearing testimony at his

trial.

> Unlike the detective in *State v. Barr*, 126 Ariz. 338, 615 P.2d 635 (1980), on which appellant relies, Fazz never told appellant that he did not intend to arrest him. Rather, Fazz only told appellant that his cooperation would probably keep him from going to jail immediately, but make it clear that the county attorney would make the ultimate decision on that. Under these circumstances, the trial court did not err in finding that appellant's statements were voluntary.

(Exhibit C, pp. 7-8 (footnote omitted).)

Rushdan contends that, contrary to the state courts' findings, his statements to Fazz "were not voluntary and any waiver he may have made was not infused with any awareness of the rights he was abandoning nor the consequences of abandoning those rights, since both Fazz and Peasley repeatedly advised him in both words and actions that he would not be prosecuted if he cooperated with police against Sandford." *Petition*, p. 27. At the voluntariness hearing, Fazz testified that he first had contact with Rushdan in Moreno Valley, California, on July 28, 1994. R.T. dated March 13, 1997 at 5, 13. They met in a convenience store parking lot at 1:17 a.m., and Fazz asked Rushdan if he would be willing to go to the Moreno Valley Police Department and Rushdan agreed to do so. *Id*. at 8. They arrived at the police department at about 1:50 a.m. and Fazz recorded Rushdan's statement. *Id*. at 8, 15. At the beginning of the tape-recorded interview, Fazz advised Rushdan of his *Miranda* rights. *Id.* at 11, 153-54. Despite his testimony at the suppression hearing that he was led to believe he would not be prosecuted, *id*. at 154, Rushdan indicated that he understood his rights, acknowledged that no threats or promises had been made, and indicated he was willing to answer questions. *Id*. at 12. However, later Fazz acknowledged that he did tell Rushdan that he would not put him in jail, but expressly qualified that statement by stating that he did not "intend at this time to put you in jail." *Id.* at 64.

If the entire record consisted only of this recorded statement, then this Court would be unable to find clear and convincing evidence undermining the presumption that the state courts' factual determinations were correct. *See* 28 U.S.C. § 2254(e)(1). However, as Rushdan asserts in his Motion for Reconsideration of Voluntariness Claim (Doc. 121), there

is much more for the Court to consider. At the evidentiary hearing, Rushdan testified that he contacted Fazz through the Moreno Valley Police Department and arranged to meet him in a Circle K parking lot around midnight. TR1:48. After arriving at the Circle K along with another officer, Fazz patted Rushdan down and they both got in Fazz's unmarked police car. TR1:48. Rushdan told Fazz he did not shoot Soto. TR1:48-49. Fazz responded that there was "a lot we need to discuss" and, rather than proceeding to the Moreno Valley Police Department, pulled into the parking lot of a Stater Brothers grocery store. TR1:49. Fazz told Rushdan to get out of the car and stand at the trunk of the car. TR1:49. Fazz told Rushdan that he knew he was not the shooter and that he was not going to jail, whereupon Rushdan told Fazz "everything that had occurred." TR1:51-52. Fazz then told Rushdan they would go to the police station and get his statement on tape, that he would have to read him his rights, but not to concern himself that he was not going to jail. TR1:52-53.

Were it not for Fazz's statements during the subsequently recorded statement and the admissions that surfaced before and during this Court's hearing, Rushdan's testimony might not be that persuasive. Turning first to the transcript of the taped interview, after Fazz provided Rushdan with Miranda warnings, he stated:

> Okay. I apologize. Let me just kind of – just kind of maybe put your mind a little bit at ease and explain things to you, and I know we kind of been over it and I think you've got a good sense as to what's going down. I think – I think you – you have in fact I have – I have heard already but now, prior to this I – I also thought that you've been wanting to talk to one of us to get it off your chest and – but you got some right to concerns. You're afraid of, number one, am I gonna believe [sic] what you got to say for one thing. Number two, you have some people that you think are going to harm your family and you – you're concerned about your family, which is a righteous reason, and the things that I can do – the one thing that I will do for you is – most important, I'm going to be – tell you the truth about everything. Okay. To be honest with you, I cam here with every intention of picking you up and putting you in jail based on what I had. Some new things have surfaced. I don't – the fact that you came to me, I don't – I wan to emphasize how important that was that you came [to] me because now – in that tells me that a lot of what you been telling me, there's got to be some truth behind it because why else would you come and talk to me about it. I can understand why you'd run and hide if you were guilty, and even if you were just scared. Those make sense, but you coming and talking with me is going to help yo

- 22 -

a lot in that respect. And it may help you in being able to go home tonight. Okay. One thing we do want is that you make sure I – you're somewhere where I can get ahold of you. Okay. And, I'm going to have to talk to the County Attorney and run it past them. He may decide no, we need to put him in jail. If that's the case, I'll – you know, I'll give you a call and say "hey, they want you in jail right now." Uh – don't concern yourself with the fact that you'd be going to jail. You gotta look at this where you're gonna be five, ten years down the road.

*Pet.'s Exhs. For Evid. Hrg.*, Ex. 2. In putting Rushdan's "mind at ease," in referencing that they had "been over it . . . ," and that Rushdan had "a good sense as to what's going down," Fazz corroborated Rushdan's account. Consistent with Rushdan's testimony, these statements establish that discussions occurred before Rushdan was given his *Miranda* warnings.

Fazz also implies a number of times that Rushdan's cooperation would keep him out of trouble. Fazz tells Rushdan that his cooperation "may help you in being able to go home tonight." Then, after telling Rushdan that the County Attorney might want him in jail, Fazz tells Rushdan not to concern himself that he might be going to jail. He also promises protection from Soto's family. Just prior to discussing the substance of what happened, Fazz says:

What I'm gonna do is I'm going to – you and I and the County Attorney need to talk. He's not in Yuma right now because I called him this evening. He's out of town until Monday. Uh – I'm gonna need to get with you and we'll do it over the phone and we'll tell him what you – what we discussed and then we're gonna find out how we can work this into keeping you involved with this without getting you into any trouble.

Ex. 2, p. 5. This last statement raises at least two important points: first, Fazz would not be in a position to know that he might be able to keep Rushdan out of trouble unless he had already interviewed Rushdan about what had happened. Yet this statement appears *before* any substantive issues are raised in the recorded statement. Second, this statement, at a minimum, implies that Rushdan's cooperation will result in him not getting into trouble.

These considerations call into question the findings of the state court. In rejecting this claim on appeal, the Arizona Court of Appeals noted that "Fazz gave appellant *Miranda* warnings, and appellant clearly waived his rights before he answered any questions in the

- 23 -

recorded interview." While that finding is accurate, it ignores the fact that Fazz questioned Rushdan before the recorded statement was taken. Next, the Arizona court stated that Rushdan "confirmed in the interview that Fazz had not made any promises . . . ." Although Rushdan may have made such a confirmation, it is directly contradicted in the transcription of the statement. Fazz told him that talking would help him "go home tonight," told him not to concern himself with jail, told him not to worry about Soto's family, and that he would work with the County attorney to keep him involved "without getting . . . into any trouble." These statements constitute specific and tangible promises of leniency that cannot be ignored.

A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (quoting *Bram v. United States*, 168 U.S. 532, 542-43, (1897)). A confession is involuntary whether coerced by physical intimidation or psychological pressure. *Townsend v. Sain*, 372 U.S. 293, (1963). As the Supreme Court noted in *Malloy*, "[w]e have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." 378 U.S. at 7, 84 S.Ct. at 1493 (citing *Haynes v. Washington*, 373 U.S. 503 (1963)). More direct than implied, and more substantial than slight, the statements by Fazz constitute the sort of promises that exert improper influence.

The Arizona Court of Appeals nevertheless concluded that, "[v]iewed in context, the foregoing statements by Fazz do not constitute the kind of promises that would render [his] statement involuntary." This conclusion is not reasonable. Viewed in the overall context of this case, Fazz's statements were entirely consistent with the manipulative and abusive manner in which Rushdan was treated in relation to both Sanford's case and his own. Peasley variously testified as to the existence of an agreement with Rushdan. When he was put in a position to defend Rushdan's prosecution, Peasley testified that he was not being vindictive, Rushdan just failed to live up to his agreement. TR1:119 ("If he failed to cooperate, didn't show up at the preliminary haring or didn't show up at trial, then bad things were going to happen to him."); TR1:122. When Peasley was questioned about whether the

oral agreement to testify should have to be disclosed to Sanford's defense counsel, he testified there was no agreement. TR1:138 ("He has no agreement with the State of Arizona, didn't have it at the time of the preliminary hearing, does not now."); TR1:140 ("There is absolutely no evidence whatsoever that there was any kind of agreement that was ever made in this case."). If the state itself cannot decide if any promises were made, it is well outside the realm of reasonableness to expect a 19 year-old high school drop out to do so. Judged in its proper context, it is apparent that Fazz initially, and Peasley and Fazz later, walked a fine line with Rushdan and the court system. Their game involved the manipulation of people and the twisting of the truth. "The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not to win, but to do justice. . . ." *Commonwealth of The Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 486 (9th Cir. 1992), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997). Here, that special obligation was abdicated and resulted in the vindictive prosecution of a defendant whose involuntary statements were used to convict him.

Considering the totality of the circumstances, this Court concludes that the psychological coercion brought to bear upon Rushdan produced the statements that led to the conviction. Rushdan's statement was not "the product of a rational intellect and a free will." It was not voluntary. *See United States v. Andaverde,* 64 F.3d 1305, 1313 (9th Cir.1995). Accordingly, the Court recommends that the District Court find that the trial court's conclusion was a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law," as is required for habeas relief under 28 U.S.C. § 2254(d)(1).

### 4.    Sufficiency of the Evidence

As the Court has concluded that Rushdan is entitled to a new trial based on his claims of vindictive prosecution and the use of his involuntary statements, this claim is moot.

## III.    RECOMMENDATION

For all of the above reasons, **THE MAGISTRATE JUDGE RECOMMENDS** that the District Court, after its independent review, issue an Order **denying** Petitioner's claims

of actual innocence and insufficiency of the evidence, **granting** Petitioner's claims of vindictive prosecution and involuntary statements, **granting** the Motion for Reconsideration of Voluntariness Claim (Doc. 121), and **granting** the Petition for Writ of Habeas Corpus (Doc. 1) if, within one hundred and twenty (120) days from the date the Judgment becomes final, or 120 days after appellate proceedings have concluded (whichever is later), the state has not to file charges against Rushdan.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 05-114-TUC-FRZ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 30th day of July, 2010.

Jacqueline Marshall
United States Magistrate Judge